May it please the Court. My name is Greg Cook, and I represent Nevada Power, Your Honor. I would like to spend most of my time addressing the issues that the Court and the parties raised earlier. First of all, let me distinguish who we are. We are an electric utility that buys natural gas for retail. We want the natural gas to burn in our generators, Your Honor. Now, you do sell some excess, is that right? Of course, that would be a factual issue, Your Honor, because it's a 12B6 that we got dismissed on. I believe, as a factual matter, it's not in the pleadings. I believe as a factual matter that if we have excess at a particular day and time, the gas comes down the pipeline and we don't need it at that time. We would resell it, but we would not be claiming damages, Your Honor, for any portion that actually gets resold as a matter of fact. I just simply want to make sure we have the facts straight. I guess to complete that, Sierra Pacific is now dropped out, is that correct? Yes, sir. That's absolutely correct. That's the dismissal. And we have – there were statements in defendant's brief with regard to Sierra Pacific's activities. I take it it has activities separate from Nevada Power, and those other activities are not part of the claim being pursued by Nevada Power. Is that correct? Sierra Pacific is the holding company of Nevada Power and also the Sierra Pacific Power Company. And we're pursuing claims only on behalf of Nevada Power, Your Honor. Our claims are very similar to the Gallo claims. We claim for antitrust conspiracy for, among other things, killing a planned pipeline that would have brought a whole new source of natural gas from Canada to Nevada, Your Honor. We claim for, and boiling this down very simply, the false representations to the indexes on sales by the defendants and also false representations about the market conditions and the reasons for those market conditions. We were dismissed on a 12B6, whereas Gallo was allowed to do their discovery. Last difference I should add is that a fair amount of our damages are what are called swaps, or over-the-counter financial derivatives. They are purely financial instruments that never contemplate actual physical delivery of gas, and those are a substantial portion of our damages, Your Honor. That would not be something that is being claimed in the Gallo case. Is that the hedging activity that's referred to in the briefs? Yes, sir. I should also say that I do not believe we are claiming for any wash sale transactions as well, which I believe is a difference between us and Gallo. Otherwise, our claim is very similar. I want to go back to a question that you asked, Your Honor, at the beginning. I believe Mr. Fogelman addressed it as well, that the question is the appropriate forum in this case, Your Honor. We would agree that that's the question. If we thought that we had relief at FERC, we would have gone there. We did so in the electricity context. This Court in December decided a case where our company was a party in this No-Homage II case because we thought we had jurisdiction at FERC and that's where we went. The difference is the Natural Gas Act has been amended and the Federal Power Act has not been amended. The other difference is there's a structural difference in the marketplaces. The gas market is unstructured, whereas in the electricity market you have in California, you had a PX. Everybody who was buying at the PX was buying for resale. There wasn't a mixture of retail and resale transactions going on at the same place and same time. But that's what's going on here. When he says, Mr. Fogelman says that there is exclusive jurisdiction of the wholesale markets, he's using a word that doesn't actually appear in the Natural Gas Act. The word wholesale appears in the Federal Power Act. The difference is that the Natural Gas Act uses the term sales for resale, which is a more precise term, and historically the word wholesale may have been unambiguous in the natural gas field. It no longer is because the Natural Gas Act has been amended, and as a fact the structure of the markets have radically changed in gas, and therefore when you use the word wholesale, it's an ambiguous term now, because we are buying in large bulk purchases at the same time, at the same place, off the same pipeline as are other people who are buying it to resell. At the same prices? Well, sometimes, Your Honor. The market is an opaque market. It's not like the PX, where there was one clearing price at one particular point in time. In the natural gas market, people engage in bilateral transactions. They call them up and ask, do you have some spot gas I can buy today? They do it based upon what they perceive the market is, what the price they perceive is. They also enter into term contracts, Your Honor, which sometimes incorporate directly by reference the index price. And again, that index price is something that private corporations formulate, Your Honor, with a formula, and they take reports from lots of people of all kinds of sales. They take reports of retail sales, they take reports of first sales, and they take reports of sales for resale and put it into a formula, Your Honor. It's not something that FERC has approved. It's not like the PX, where there was a tariff submitted to FERC with lots of rules on how the PX would work and how the prices would be calculated, and FERC approved it. And the PX was a public utility under the Federal Power Act and therefore subject directly to FERC's jurisdiction. That's not the case. These are McGraw-Hill is a private company, and it's doing, it's figuring however it wants to with its formulas, what the prices are going to be in those indexes, Your Honor. The question was raised about the contract or the purchases made by Nevada Power. We asked this question to Gallo. Do you have a contract that's got a pegged price or what? What's the situation for Nevada Power? We have multiple situations, Your Honor. But that's what I suspected. Do you have contracts that are in fact pegged to whatever the index, whatever McGraw-Hill prints? Yes, sir. We have contracts that are directly pegged. And what I would assert is that merely participating in the same market or using the same index that might have a jurisdictional price in it does not transform our transactions into jurisdictional transactions. If you reduce their argument to its most basic, Your Honor, they're saying that if you put, if you have one jurisdictional transaction that gets put into the average, that anybody who uses that average is then contaminated, and that's subject to FERC's jurisdiction. How can you talk about how you can show your damages without asking a court to shed doubt on a result of a jurisdictional sale, assuming that that's covered by the filed rate doctrine? Yes, Your Honor. The, we would compute our damages in multiple ways, and I hesitate because we're at the 12B6 stage, and so I haven't worked this out entirely with experts, and I haven't seen the discovery, so it's difficult for me to articulate in detail. But an antitrust, our antitrust claims, Your Honor, we would use either a benchmark or yardstick method that are the standard antitrust methods, a before and after version of what our prices were, a looking at, look at what other markets would have, Your Honor, have our experts use a yardstick methodology. As to the transactions that were pegged directly to the index, Your Honor, we could disregard the index and have our, have our experts determine what the competitive price would have been absent the index. We could have our experts ignore the jurisdictional prices in the index and regress those out of the index, Your Honor. There are a number of ways we could address that, and again, I hesitate because we're at the motion to dismiss stage. It seems to me, is there anything you can do that doesn't at least cast a pretty dark shadow on an index price, and I'll make it a very simple example. Suppose we have a pegged price. An index price that is likely being used in other transactions, even as you speak, in other jurisdictional transactions to be a, quote, FERC price. It seems to be inescapable that if you're allowed to calculate damages under any way I can think of, then you are, and this doesn't say that that leads to a result you don't like, but you are at least on some level saying there's something amiss with this price, which is a FERC price. Your Honor, we're not asking that any FERC transaction be undone or altered in any way. The people who sold the gas in jurisdictional transactions get to keep the money from their sales, Judge. And the people who bought the gas get to keep the gas. We're complaining about what we paid in our unregulated transactions. There's a, to use a very simple analogy, this case, in the traditional cases, the file rate doctrine is applied in a vertical context. Either you as a plaintiff are directly attacking the transaction you bought at, which was a jurisdictional transaction and therefore has a file rate and therefore is barred by the file rate, or in the Nantahala case, you're attacking a transaction upstream of your transaction that was a FERC jurisdictional transaction. So you are in a vertical methodology. You are looking upward. They are arguing that the file rate should be expanded, Your Honor, to a horizontal context, that merely participating in the same market somehow transforms your transaction for being jurisdictional, from non-jurisdictional into jurisdictional. And they can't cite any cases in the file rate doctrine is not a favor doctrine to be expanded, as this Court noted in the cost management case. The Supreme Court has noted that it's, well, this Court described the Supreme Court's last decision where they discussed the analytical framework of the file rate doctrine, the square D decision, as being a lukewarm endorsement and cost management refused to extend the doctrine. Your Honor, you ask what would FERC do if FERC was here. Well, they're not here, Judge, but they have spoken on this issue. Another party, the NAGC, brought an action, FERC, complaining that the prices in the transactions in the marketplace were too high. And FERC said, we're sorry, we don't have jurisdiction over first sales. We can't set a market-wide price because we don't have jurisdiction over some of the sales in the market, and refused to do that. Now, we didn't bring a case because we thought that would be the result, but the NAGC did. FERC has spoken. Someone did go to FERC and ask their permission, and FERC said, no, we can't do that. FERC has jurisdiction over transactions, not markets. The statute says transactions over sales. It doesn't say over markets. There's no penumbra effect for the filed rate doctrine. FERC is a creature of statute, and so it's either jurisdictional or not jurisdictional. It surely can't be upstream or earlier on the well end. Once FERC's jurisdiction has kicked in, though, it, I mean, our county of, who's it, Stanislaus, Your Honor, makes it, I have to confess, these names have blurred together after a while, makes it clear that there is something downstream that's still within a penumbra of FERC exclusivity. Well, you're downstream. I don't know. Some of your sales may be first sales. I don't know whether or not all of them are, but at least the main appearance you're making here is as a ultimate purchaser. And so that raises the possibility that your gas came through somebody else that is FERC regulated. Does that matter? Your Honor, the Stanislaus case was decided before the natural gas, major natural gas amendments went into effect. Actually, the transactions were. Transactions were. Received them, yes. The transactions there, Your Honor, were in the mode of the Nantahala case because the attack, even though they were retail purchasers, they were attacking, the complaint they had was about the earlier sales upstream, vertical in that transaction. And so those were regulated jurisdictional transactions they were complaining about. Just like in Nantahala, there would have been a trapping of the cost. So the jurisdictional seller would have lost his benefit. And, therefore, the Court said, no, you can't go up the chain and attack a transaction that's jurisdictional. We're not attacking a transaction that's jurisdictional. We're attacking the transaction we bought in. And we don't have a wholesaler. We're a large bulk purchaser. We don't have a wholesaler sitting ahead of us in the transaction. Our complaint alleges, and it's at the motion to dismiss stage, and this is an affirmative defense, so it's their burden of proof. Our complaint alleges that the normal course of events is that a producer sells it to a marketer who sells it to us. And we have an expert's affidavit to the effect that that is the way it normally occurs. And in that paradigm, the sale upstream is going to be a first sale, Your Honor. Well, the sale to the marketer is a first sale, and there's no other middleman there? That's just the only one? Yes, sir. Now, I say that. That's the normal course of events. We're at the motion to dismiss stage. I can't tell you and represent to this Court that every single transaction is that way, but it's an affirmative defense. It's their burden to show you that that's the case. Your Honor, I want to address one other issue, and I'm going to reserve the rest of my time. Mr. Fogelman had referenced a proceeding in which he claimed that we at Nevada Power were claiming at FERC for our gas costs. I want to explain that, Your Honor. There is an electricity docket that this Court has handled on appeal, Your Honor. And as a part of that electricity docket, FERC has to determine the costs that are appropriate for the sellers of electricity. Nevada Power sold and bought electricity into California, and therefore FERC has to determine the appropriate cost figures, just as it does for employee salaries, for paperclips, for tree cutting, for anything else to run our generators and run our plants to determine what the cost should have been for our electricity. That's what he's talking about, Judge. And we've conceded in our briefs, Your Honor, that if there is any cost damage mitigation, Your Honor, from an increased cost factor in the electricity docket, that that would not be something that we'd be claiming for. Thank you, Your Honor. I'll reserve the rest of my time. Your Honors. Welcome back. May it please the Court, I am here on behalf of the appellees in this case, Semper Energy, San Diego Gas and Electric, and Southern California Gas Company, and speaking also on behalf of other appellees as to these file rate and preemption issues. If the Court has questions about the RICO part of the decision, Mr. Ferchero is available to address any questions the Court may have on that. But as you can hear from counsel for Sierra Pacific and Nevada Power, the issues do overlap with the Gallo case and the cases to follow. And so my remarks should, I hope, be construed to apply to all these cases, since they are so overlapping. But let's start with the premise of why we're here. It doesn't take a lot of attention to the news to know how important the nation's energy policy is. And the nation's energy markets are essentially through these pipelines throughout the United States and the electricity transmission grids are essentially the lifeblood flowing through our country, just like the veins flowing through our body are our own lifeblood. And Congress drew upon its Commerce Clause power to regulate the interstate connection and the interstate transportation and interstate sale of natural gas and electricity. And that's something it delegated to FERC. And that's something that the Supreme Court recognized in the 1972 FPC case. And it's important to keep in mind that the statutes that they've enacted are much broader than counsel for Sierra Pacific and Nevada Power make out. They are not limited to a transaction. In fact, they are quite broad, just as they are in electricity. And they say not just with regard to transportation of natural gas or sales for resale, but anything in connection with the transportation or sale of gas for resale, which is quite broad. And the bright line that you've heard about this morning is not a bright line about retail versus wholesale. There is no bright line. FERC's jurisdiction is plenary over most of these issues. The bright line you usually hear about is a bright line between State and Federal law. And to the extent that the preemption arguments were raised earlier. But it's very clear that the statute says we don't regulate retail sales. What brighter can you get? Well, let me explain why it's not as bright as you would think. If you look at the Supreme Court authority on point, you start with the premise that the FERC is not setting retail rates intrastate, either in electricity or gas. And I would note, Your Honor, you asked earlier about Section 1B. Section 824BD of the Power Act is the same. Same limitations. In electricity, you've got the following cases. Entergy in 2003, unanimously decided. Nantahala, you've got that decision from 1986 by Justice O'Connor. Again, unanimous. And you have also Mississippi Power and Light from 1988 by Justice Stevens. In each of those cases, what were they talking about? Retail rate setting. No question that FERC does not set the rates intrastate for the retail price of gas or electricity. But in each of those cases, what the state commission charged with setting the rates was trying to do was to assume that something happening upstream, something in FERC's domain, was done wrong. They weren't actually going into the wholesale markets and trying to reset wholesale cost allocations or power allocations or wholesale rates, but they were assuming for purposes of setting retail rates that something was done wrong under FERC's jurisdiction. And the Supreme Court in each of those decisions said you cannot do that. Even in the unquestionably state regulatory power of setting retail rates, you can't assume for purposes of setting those retail rates that something within FERC's jurisdiction was done wrong. But in each of those cases, the rated issue was a FERC jurisdictional rate. That was the one that the court said state regulators, you can't deem them to be wrong and thus trap the cost. That's not the case here, is it? I don't think this case is distinguishable from the county and status law case in that regard. And in county and status law, the Ninth Circuit said those cases are not limited to cost trapping. They're broader than that. And they talk about asking a jury to assume for purposes of damages a hypothetical rate that you claim would have existed in the jurisdictional markets passed through either directly to you or to the Mary Grogan's and the retail customers. It doesn't matter. That's the same hypothetical rate that the Gallo plans want to set in the PG&E border market and that Nevada Power wants to set in the TOPOC market. And the TOPOC market is something that FERC has expressly talked about. And it has said in its 2003 Reliant Order and its 2003 Enron Order that it has jurisdiction not only over physical sales in those border markets, but over any electronic trading platform sales which relate to those markets. So it's pretty much everything. And I'd also like to point out the Court's decision, the Supreme Court's decision in Schneiderwind, another one which blurs this line that Judge Fletcher has talked about. In that case, the State of Michigan was asking the gas companies to register and seek approval with the State of Michigan to issue securities. No one was questioning whether FERC was the right organization to regulate securities, but what they were questioning is why was the State of Michigan involved in asking gas companies to come to it to ask about securities. And the answer was, by doing so, even though securities were within the State's regulatory power, you were interfering with FERC's ability to regulate this interstate network of gas transportation and prices. And if you let the 41 cases that have already been filed in gas in this case and the hundreds that might follow, you are going to have the same result that you would have had in the Entergy, Nantahala, Mississippi Light, and Schneiderwind cases, or ARCA before that. You're asking a jury to reach up into FERC's jurisdiction over both the conduct at issue and, more importantly, the rates in the wholesale market, and assume, for purposes of setting damages, that something was done wrong, that a different price structure should have been found. You will ask each and every jury to decide how the gas should have been transported and what the just and reasonable rate would be. And the Supreme Court said in ARCLA in 1981, Justice Marshall, you can't, in awarding damages, assume a rate not filed with or approved by FERC. Now, it didn't limit its holding to the particular transaction in that case. It's a broad and sweeping holding that's been relied upon by other Supreme Court cases and by the Ninth Circuit. And I would note that the rate in question, in this case a sale to Nevada Power, isn't a rate, isn't a sale within FERC's jurisdiction and, hence, not a sale for which a rate would be expected to be filed with FERC. What's the problem? I mean, has anybody filed the rates on sales to Nevada Power with FERC? Your Honor, the way the gas market works is similar to electricity in that it's a market-based regulatory regime  So the question is, is that a rate that is itself filed with FERC or FERC? Oh, God, no. I understand all that. You don't need to give me that primer. But I'm asking, is the rate that's at issue in this case, the hypothetical rate that plaintiffs will purportedly seek, is that a rate that is itself filed with FERC?  The hypothetical rate that each plaintiff is asking for. What's the problem? Okay. The problem is that they're asking a court to assume a rate other than that approved by FERC. FERC is charged with Not a rate that's filed with FERC in the first place, so why can't you assume that? Well, you can't assume it anymore in this case than you could in Cal v. FERC, Your Honor, which you were familiar with, in which the court said, and quite regularly so, even if the rates were never filed in electricity, a file rate doctrine barred in the claims would still exist. And that's why it's inherent in the market-based rate authority, which is identical in gas and electricity, to issue retroactive refunds through the complaint process if there's a problem. And I would note, because this came up earlier, that the people involved in Cal v. FERC were the people of the State of California, including all retail and wholesale customers. And they were seeking refunds at FERC, both for retail and for wholesale. And in Dynegy, the State of California was told for all of its residents, not just wholesale, but retail as well, the file rate doctrine bars the claims. And in County of Stanislaus, all claims, retail, wholesale, barred by the file rate doctrine. And the State claims, of course, in each of these cases are barred by a preemption, just like in Schneiderwind. So you have a lot of cases out there that talk about the importance of not having a rate be filed because the Supreme Court has said that we're not even limiting the file rate doctrine to rates per se, language that's been echoed by the Ninth Circuit in the tank case. But we're talking about conduct that is regulated by FERC, and that if you allow a jury to interfere with FERC's regulatory authority over the conduct, you either directly or indirectly interfere with FERC's ability to regulate the rates. That's what we're talking about in each of these cases. And, you know, just to talk about some of the charging allegations in this case, they're very similar to the Gallo case. They talk about the border market at Topak and interstate transportation capacity getting it to Topak, whether a pipeline should have been built from Canada to California. That sounds an awful like the pipeline constraint theory in the County of Stanislaus. Same thing, where the Court was asked to assume that a pipeline would have been built from Canada or not built, but there would have been new pipelines that come online and relieve some capacity constraints. And they assumed as well, they were asked to assume as well, that that would have allowed a cheaper source of gas, identical, really, to the allegations here in this case, and that they would have been able to pay a cheaper price for gas. And the Ninth Circuit said, if you're asking me to assume, us to assume or any court to assume, a hypothetical rate for gas, we can't do it. That's barred by the filed rate doctrine. But that's what everyone is doing in all the cases before this Court today. This isn't a question like in Columbia Steel, where the filed rate doctrine was not applied by the Ninth Circuit because there was no hypothetical rate setting involved. But it's an interesting point to raise. In that case, in the City of Portland, there were two electric companies. Let's call them A and B. And the plaintiff was required to buy power from A. B was cheaper. The complaint was, there's a division of the market. We want to buy from B. And the court in the Ninth Circuit said, well, you can bring this claim because it's only a question of whether the market was divided. And if you're right, there is no hypothetical rate setting. B charged whatever it charged. A charged whatever it charged. So if you're right, the difference is A minus B. The Ninth Circuit in County of Stanislaus said, that's not this case. In this case, you're asking the court to engage in hypothetical rate speculation. That's what the Nevada Power people are doing here. The Gallup people are doing in the Gallup case. And the county and the Texas, Ohio people are doing in that case. In each case, they are asking a court to assume that the transportation and sale of natural gas for resale would have been different. And that the prices in the market price, in the border markets, Topak or Citygate or Malin, what have you, would have been different. No court in the Ninth Circuit or the U.S. Supreme Court has ever allowed that to go forward. You heard the suggestion that damages could be calculated by various methods without actually attacking a jurisdictional transaction rate. Could you address that? I can, Your Honor. The answer is impossible for two reasons. First, all of their claims, as alleged in the complaint, are tied to the border market. This is their words, the border market at the California, Topak, Arizona, Nevada border. So we're talking about the border market, the same border market that FERC has jurisdiction over. And I'm sure the court can think about molecules of gas. They're not able to differentiate themselves, whether it comes from Canada or Mexico or on a ship from South America. Once it enters the interstate system in the United States, it's just gas. It's molecules. And you can't separate where it came from or what have you. But the other thing is that the prices that they're asking to reset, this is the second answer to your question, in their damage model, as you can see it in the complaint, they don't say we're asking for some retail analysis. They say that the prices at the border market would have been different, but for the allegedly anti-competitive conduct. And their damages are the difference between what they paid and what they would have paid had there been this just and reasonable price. So by definition in their complaint, they're talking about cases, speculative rate setting in that market. As far as the appropriateness of a motion to dismiss, County of Stanislaus was a motion to dismiss. Snohomish, motion to dismiss. Dynegy and Grays Harbor, motions to dismiss. You can't really have these cases going forward to decide whether it was a, you know, there's some molecule of gas out there which might be subject to a state or federal court. If you do that, just the threat of these multibillion-dollar claims has the same impact on FERC's ability to make sure that gas is going to where it has to go at just and reasonable rates as an ultimate judgment would be. Just the mere threat of all these jurisdictions preventing the free flow of gas is enough to interfere with FERC's jurisdiction. That's it. You can't let these things go to discovery and figure out whether it was a first sale. And I want to talk about first sales briefly if I can because it's been raised both by Gallo and again here. This isn't a question about first sales, and they're not even alleged by Gallo, and they're not properly alleged in the complaint in this case. This is about the wholesale border markets and the speculative nature of the damages by assuming a different rate in those markets. But I don't want this Court to come away with the impression that FERC doesn't have any jurisdiction over first sales. That's not the case. The NGPA was adopted in 1978 and had gone into effect well before County of Stanislaus was decided, and the Wellhead Decontrol Act of 1989 had gone into effect before the close of the damage period in County of Stanislaus. There is no substantive difference between the regulatory framework we're addressing now and the regulatory framework that existed at the time of Stanislaus. And in that regulatory framework, there is a limitation on FERC's ability with regard to first sales. But it isn't that they have no jurisdiction. It's that they don't have jurisdiction over a first sale solely because it's a first sale. And that means when Congress was going towards this national market-based regulatory environment, as the Supreme Court outlines in Schneiderwind and in ARCLA and others, what it wanted to do was make sure there were no price caps artificially creating a supply and demand problem. And the last thing that happened with this WDA in 1989 was that they removed the last of the price caps at the Wellhead, and that's what a first sale is essentially. Some complicated definitions, but it's the first sale from the production to somewhere else. But Congress did not remove FERC's jurisdiction over all aspects of first sales. And we cited in our papers some of the statutes that still exist. For example, one of the things that it can do is require that first sale contracts be filed with FERC. Another thing it can do is it can investigate whether a first sale was a result of fraud. And if it was a result of fraud, it can prevent the person from recovering its costs in the first sale. Now, if Congress expected that FERC would have no jurisdiction over first sales, why did it leave FERC that power? And on top of that, first sales are defined by Congress to be just and reasonable as a matter of law. That was a decision made by Congress in enacting these acts, because the Wellhead doesn't have a problem with market power on its hands. Well, that suggests that Congress has enacted a no-law zone. No, Your Honor. I've got to say, that's implausible. I recognize that that was implausible, but I'm not suggesting that one is here. What I'm suggesting is, and the Court found this, the Supreme Court talked about this in Transco, just because the Congress decided to limit in some way FERC's jurisdiction doesn't mean it was leaving open for others, including States, to jump in and regulate these first sales. FERC has sufficient jurisdiction to regulate all the conduct at issue in this case and jurisdiction identical in all material aspects to those in electricity where refunds are going forward and this Court is familiar with all its decisions in that context, where the file-break doctrine was applied or held applicable and that the primary and only jurisdiction was of FERC. That's what we're talking about here. Again, it's not whether we're right or wrong, whether pipelines would or would have been built. These are issues for FERC to decide. And if you let a court, whether it's in Fresno in the Gallo case or in Las Vegas in this case, decide for itself that, you know, we think that when you had an average of sales of 5, 7, and 9 and you reported the average of 7, you should have reported all of them. Or if you have a person in these juries deciding, you know, that transaction between wholesale companies, that didn't have legitimate business purpose, so we're going to call that a wash trail, a wash trail. You can't do that and stop. Go ahead. Getting back to the first sales, one interpretation that we received was that you need to read the section about any amount paid in any first sale of natural gas shall be deemed to be just and reasonable with the guaranteed pass-through section which indicates that this allows natural gas companies to receive the full amount paid for those first sales. And that that was the appropriate interpretation of those two statutes with an eye to legislative history. Can you comment on that interpretation? Yes, I can. I think the pass-through issue dovetails with what I mentioned earlier. Congress decided that they didn't want to interfere with the wellhead, so they were coming up with a way of finding that those rates and those sales shouldn't be interfered with at FERC. But it did give FERC the ability to stop the pass-through if it found that the conduct was by fraud, and that's the statute we referenced earlier. So I don't think that first sales are the issue here, and I don't think that there's a material difference between the gas and electricity standards. And I think if we look through the litany of cases, and there is truly a litany of cases on these issues for gas and electricity, you can see an almost unending line of cases where they rely upon gas in the electricity context and electricity in the gas context. ARCLA relied on Montana-Dakota. Hygiene and Energy relied on Stanislaus and ARCLA. Stanislaus relied on Nantahala, Grays Harbor on ARCLA. It goes on and on and on. So nothing has happened in the regulatory regime in the last two years to suggest that gas and electricity statutes are no longer the same. The statutes are essentially the same. And it was okay to find the file rate doctrine. It was the right result applied in the electricity context. It is the only result that can be found today, consistent with the U.S. Supreme Court and Ninth Circuit authority before now. And I think what's important to keep in mind is that as Judge Clifton was asking about, there is a remedy at FERC. You don't have to be a wholesale customer to file a complaint. And it doesn't matter that the Supreme Court has said repeatedly in the cases we cited and the Ninth Circuit has said that even if a remedy is not available, the file rate doctrine still applies because in this case a remedy is available. If there's merit to the claims, and we don't think there is, they'll be adjudicated at FERC and appropriate relief is available then. This is just a question of making sure there's a national market uniformly regulated by FERC and not have clots in the artery all along the way. Thank you for your time. Mr. Cook, I guess you've got some time left. Thank you, Your Honor. Let me briefly address the Stanislaus issue. We're not, of course, admitting that there would be any need for a hypothetical rate here, but the problem with the hypothetical rate in Stanislaus was that the new rate would be imposed in jurisdictional transactions, whereas that would not be the case here. Your Honor, this case is not about transportation costs. We are not making a claim for transportation costs. And, of course, the plaintiff is the master of their complaint. To the extent that they think they can prove some component of our prices that we paid are transportation costs and should be disregarded, that's a factual issue, Your Honor. As far as the conduct we are complaining about, we are not complaining about their jurisdictional sales, Your Honor. We are complaining about the lying that they did after their sales. And, by the way, some of their sales were not jurisdictional as well because they made retail sales. And, of course, that activity would not be jurisdictional. It becomes jurisdictional when subsequent sales that are jurisdictional wind up being based on the same index you're complaining about. My favor, let's accept the allegation of the complaint. They've reported excessive prices. Yes, sir. Index comes out at 8, should be 6, but it comes out at 8. Right. There are jurisdictional sales at 8 because everybody else thinks 8 is the right number. Yes, sir. Well, now you've got it for a price that says 8. And your case is going to attack that by saying shouldn't have been 8, should have been 6. What I'm going to attack, Judge, is that my purchases, which were not jurisdictional, should not have been at 8. The fact that there were FERC jurisdictional purchases by somebody else at 8 is irrelevant, Your Honor, to me. I care about my purchases, and none of mine were jurisdictional to FERC, and none of the ones above me or I should say virtually none of the ones above me were jurisdictional, Your Honor. The 2003 rules have been referenced here briefly, and threats of interference have been referred to, Your Honor. 2003 rules on market manipulation were prospective expressly by their terms, Your Honor. They were not in effect at the time. And I would add that in 2005, Congress passed the Energy Policy Act, and FERC amended those rules and issued Order 670. And in Order 670, FERC said, quote, that fraud and manipulation in a non-jurisdictional sale such as a first or retail sale is not subject to the new regulations. So even after Congress broadened the law to include any person who, in connection with a jurisdictional sale, committed fraud, it would not apply here, Your Honor. They have said that FERC has exclusive jurisdiction over the TOPOC market. Your Honor, that is simply not true. The TOPOC market has first sales in it. It has retail sales in it. And FERC has not said that it has exclusive jurisdiction over the TOPOC market. FERC said that it had exclusive jurisdiction over reliance wholesale sales on Enron Online, which were about the TOPOC market. FERC does not have exclusive jurisdiction over the TOPOC market. And I need to emphasize that because, like the chart I drew in my brief, Your Honor, and I explained earlier, there's a producer, there's a marketer, and then there's us. There's no wholesale step in between. They talked about the Schneidwien case, Your Honor, but there's a footnote in the Schneidwien case explaining footnote 11, that laws and general applications such as the Blue Sky laws in that case would continue to apply because there was no conflict, Your Honor. The Northwest Central Pipeline case from the U.S. Supreme Court held that there were tensions inevitable because there are interlocking jurisdictions between state and federal court, but that if you every time there was some sort of tension ruled that there was preemption, that you would render meaningless the power that Congress had given to the states, Your Honor. That's 489 U.S. 493. Thank you, Your Honor. Thank you. We thank all counsel for the briefs and arguments. The Sierra Pacific case is submitted.
judges: B. Fletcher, Clifton, Ikuta